IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| JUSTIN JOHNSON, | CASE NO. _____ |
| Plaintiff, | |
| vs. | |
| | **COMPLAINT** |
| AMSTED RAIL COMPANY, INC., | **and** |
| | **JURY DEMAND** |
| Defendant. | |

## INTRODUCTION

1.　　This is an action challenging Defendant's illegal discrimination, harassment, and retaliation in violation of the Iowa Civil Rights Act, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act, as amended.

2.　　At all times material to the claims in this lawsuit, Plaintiff Justin Johnson was a resident of Lee County, Iowa.

3.　　At the time of the filing this Complaint, Plaintiff Justin Johnson is a resident of Michigan.

4.　　Defendant Amsted Rail Company, Inc. is a Delaware corporation doing business in Keokuk, Lee County, Iowa.

5.　　The acts of which Plaintiff complains occurred in Keokuk, Lee County, Iowa.

## PROCEDURAL REQUIREMENTS

6.　　On April 9, 2025, within 300 days of the acts of which he complains, Plaintiff filed charges of employment discrimination and retaliation against Defendant with the Iowa Office of Civil Rights. The complaint was cross-filed with the Equal Employment Opportunity Commission.

7.     On September 30, 2025, less than 90 days prior to the filing of this Complaint, the Iowa Office of Civil Rights issued a right to sue letter with respect to Plaintiff's charges.

8.     On December 16, 2025, less than 90 days prior to the filing of this Complaint, the Equal Employment Opportunity Commission issued a Notice of Right to Sue with respect to Plaintiff's charges.

9.     Jurisdiction is conferred on this Court through 28 U.S.C. §§1331, 1332, and 1367.

## BACKGROUND FACTS

10.     On September 19, 2022, Plaintiff Justin Johnson began working for Defendant Amsted Rail Company, Inc. as a Production Supervisor in the Molding area at Amsted's plant in Keokuk, Iowa.

11.     Justin lived in Keokuk, Iowa throughout his employment with Defendant.

12.     Production Supervisors report to the Production Manager.

13.     Production Manager Dennis Dooley was Justin's supervisor from the date Amsted hired Justin until Dooley retired in approximately September 2024.

14.     For approximately one year before Dooley's retirement, Kyle Meinhardt worked alongside Dooley and trained to take over the Production Manager position.

15.     Meinhardt acted as co-Production Manager for approximately six months before Dooley retired and was the sole Production Manager after Dooley's retirement.

16.     The Production Manager reports to the Operations Manager and the General Manager.

17.     Corey Jonas was the General Manager of Amsted's Keokuk plant throughout Justin's employment.

**Plaintiff Is Subjected to Harassment and Discrimination Because of His Sexual Orientation and Complains About the Hostile Work Environment, but Defendant Fails to Take Action to Prevent or Correct It**

18.     In approximately December 2022, a coworker told Justin that, while at work, he saw a video on another coworker's phone of Justin kissing another man at a bar.

19.     Apparently, someone at the bar took the video and somehow shared it with Amsted employees, who circulated it and discussed it at work.

20.     After the video began to be circulated, many employees asked Justin if he was "actually gay or not." They did not seem genuinely curious; they asked the question in a disapproving manner.

21.     Not long after the video began circulating among employees, Justin told his supervisor, Production Manager Dennis Dooley, that it made him uncomfortable that employees were showing the video to each other and talking about it at work.

22.     Dooley told Justin he would take care of it.

23.     However, employees continued to share the video and crack malicious jokes about it at work every day.

24.     For months after he complained to Dooley in approximately December 2022, Justin heard employees use or make derogatory comments about him and his sexual orientation, including but not limited to:

    a.   Referring to Justin as a "gay faggot,"

    b.   Saying "I heard you're gay now" to Justin,

    c.   Telling Justin that he should not be working "in a place full of dudes if [he was] attracted to them," and

    d.   Telling Justin that he should "go work at a gay strip club."

25.    In approximately February 2023, Justin complained again to Production Manager Dooley about the harassment he was enduring.

26.    Justin told Dooley that employees were still sharing the video of him and making offensive comments and jokes to and about him.

27.    Dooley talked to two of the employees in the break room, but that did not put an end to the harassment.

28.    Between February and May 2023, Justin talked to Production Manager Dooley multiple times about offensive comments that employees were making to and about Justin.

29.    Defendant did not take any action to prevent or correct the harassment, and Justin's coworkers continued to harass him because of his sexual orientation.

30.    The harassment and discrimination against Justin because of his sexual orientation consistently permeated the plant for the rest of his employment with Defendant, creating a hostile and abusive work environment.

**The Harassment Continues, Plaintiff Complains to Human Resources About the Hostile Work Environment, but Defendant Still Fails to Take Action to Prevent or Correct It**

31.    In approximately late March 2023, Justin complained about the harassment and discrimination he was suffering to Defendant's Human Resources Manager, Fred Gilbert.

32.    During this meeting, Justin told HR Manager Gilbert that he is bisexual. He told Gilbert that he shouldn't *have* to "come out" to him, but he wanted Gilbert to know how the harassment was making him feel.

33.    Justin told HR Manager Gilbert that he had already reported the harassment to Production Manager Dooley.

34.    HR Manager Gilbert told Justin that he was sorry Justin was dealing with this and that he would do something about it.

35.     Defendant still did not take any action to prevent or correct the harassment, and Justin's coworkers continued to harass him because of his sexual orientation.

36.     In approximately late April 2023, Production Supervisor Taylor Worrell heard employees in the break room talking about Justin being "gay" and making jokes about Justin.

37.     Worrell heard male employees say to other male employees, "watch out, Justin might try to fuck you."

38.     Production Supervisor Worrell told the employees that their comments needed to stop immediately and that he would be reporting their comments to HR Manager Gilbert.

39.     Worrell reported the offensive comments about Justin to HR Manager Gilbert.

40.     Worrell also informed Justin about the employees' comments, Worrell's response to the employees, and that he reported it to Gilbert.

41.     Defendant still did not take any action to prevent or correct the harassment, and Justin's coworkers continued to harass him because of his sexual orientation.

**<u>Defendant Suspends Plaintiff Without Pay</u>**

42.     On May 9, Justin accidentally sent a text message to General Manager Corey Jonas that he intended to send to another Production Supervisor, Cody Ryan. The message said, "what are you still doing up gay boy?"

43.     Justin immediately apologized to Jonas via text.

44.     The next day, General Manager Jonas spoke with Justin about the text. Justin apologized again and Jonas told him, "We can't be talking like that."

45.     General Manager Jonas did not plan to discipline Justin for the text.

46.    However, on May 17, 2023, HR Manager Fred Gilbert and General Manager Corey Jonas informed Justin that they were investigating the text message Justin sent to General Manager Jonas on May 9.

47.    Jonas and Gilbert told Justin they had to investigate the text because "an hourly employee" reported that the text message bothered him.

48.    The "hourly employee" who complained about the text was Joe Kirchner.

49.    Jonas and Gilbert understood that Kirchner had only heard about the text message from other employees and that the text message was not sent to Kirchner nor shown to him.

50.    Gilbert and Jonas interviewed Justin about the text during the May 17 meeting.

51.    Justin told them that Production Supervisor Cody Ryan sent Justin a text asking what was going on at the plant. Justin said he thought he was responding to Ryan's text in a joking manner with no bad intentions when he mistakenly sent the text to Jonas.

52.    Justin also explained that, when he realized he sent the text to General Manager Jonas, he exclaimed out loud, "Crap, I sent the wrong text," and a few people around asked what he sent, so he explained the mistaken text to them.

53.    Justin told Jonas and Gilbert that he had no intention of offending anyone when sharing his mishap and that he would apologize if he accidentally offended anyone.

54.    General Manager Jonas and HR Manager Gilbert told Justin he would be suspended without pay while they finished the investigation.

55.    On May 20, 2023, Justin met with General Manager Jonas and HR Manager Gilbert and complained again about the discrimination and harassment he had been enduring throughout his employment.

56.    Justin complained that Joe Kirchner, who claimed to be offended by the text Justin sent to Jonas, called Justin "gay" and talked about the video of Justin kissing a man at the bar.

57.    Justin pointed out the inconsistency of Kirchner claiming to be offended that he heard Justin used the word "gay" in a text message when Kirchner was known to use the word "gay" when talking about the video of Justin.

58.    Justin said, "I was actually the one being harassed and still am being harassed, and I'm the one suspended over it. I just, I just, I don't get it."

59.    Justin reported that coworker Austin Scheulka sent him messages saying "gay" and "faggot" between the beginning of his suspension and this May 20 meeting.

60.    Justin told them that the harassment about his sexual orientation was "just ongoing, ongoing, ongoing."

61.    Justin reported that coworkers continued to watch, share, and make "jokes" about the video of Justin kissing a man at a bar.

62.    Gilbert asked Justin if employees said anything to him that was derogatory or used derogatory language. Justin said, "Yeah, like Hunter Land walks up to me, 'Oh heard you're gay now.' Just stuff like that. All bunch of 'em. It's just stuff like that, for months."

63.    Justin said that he had already reported the harassment to Production Manager Dennis Dooley and asked him to handle it, but it hadn't stopped.

64.    On May 21, 2023, Jonas and Gilbert interviewed Production Manager Dooley.

65.     Dooley told them that he had known about the video being shared by employees since just days after it came out because everyone in the plant was talking about it.

66.     Dooley told Jonas and Gilbert that, approximately three months earlier, Justin told Dooley that employees were still sharing the video and Justin wanted it to stop. Dooley said that he told two employees to stop sharing the video after Justin had that conversation with Dooley.

67.     Dooley also shared that he and Justin had conversations about employees making comments to and/or about Justin after Dooley addressed the two employees about sharing the video.

68.     When asked why Dooley had not reported Justin's complaints about the video or employees' comments to HR, Dooley told Jonas and Gilbert that it was so widespread that he thought everyone in the plant knew about it.

69.     Dooley told Gilbert and Jonas that the video was "still being circulated right now," even after Defendant suspended Justin.

70.     Dooley also reported that employees were calling Justin "kissing boy."

71.     Ultimately, Defendant suspended Justin without pay for two weeks, from May 16 to May 29, 2023, "in lieu of ending [his] employment."

72.     Defendant did not discipline anyone in response to Justin's complaint about the harassment he had endured for months because of his sexual orientation.

73.     Defendant still took no appropriate action to prevent and correct the harassment, and Justin's coworkers continued to harass him.

74.     HR Manager Gilbert and General Manager Jonas told Justin that he could not discipline any of the employees he supervised and who harassed him because that would be considered "retaliation."

75.     Gilbert and Jonas advised Justin that it would be easier for him to "brush things off" and keep the employees "on [his] side" if he wanted to succeed as a supervisor.

**Defendant Still Does Not Stop the Hostile Work Environment and Plaintiff Continues to Complain**

76.     After Justin returned to work following his suspension, the harassment because of his sexual orientation continued to permeate the workplace and created a hostile work environment.

77.     In early 2024, not long before Defendant fired HR Manager Gilbert, Justin complained to Gilbert about the ongoing harassment.

78.     Justin told Gilbert that Melting Operator Justin McFadden had been making comments to him like, "go kiss another dude" and had been calling him "gay boy" and "homo."

79.     Justin told Gilbert that he was fed up with the harassment and that something needed to be done.

80.     Gilbert told Justin, "We are still investigating it all."

81.     Defendant still failed to take any action to prevent or correct the harassment, and Justin's coworkers continued to harass him because of his sexual orientation.

82.     In approximately March 2024, Defendant terminated HR Manager Gilbert.

83.     For the remainder of Justin's employment with Defendant, offensive comments about his sexual orientation and homophobic slurs multiple times each week.

84.     Examples of the unrelenting harassment include:

   a.    "Oh, come on Justin, we all know," and give Justin a look making it clear the speaker was suggesting everyone knew Justin is not heterosexual.

   b.    "You gonna go play with any boys' peepees today?"

   c.    Employees continued to bring up the video of Justin and make offensive comments or jokes.

   d.    "Been kissing any dudes lately?"

e.  "Go kiss another dude."

f.  When Justin walked by, putting their hands over their buttocks as if covering or protecting their anus, leading to other employees laughing at Justin.

g.  Referring to Justin as "gay boy."

h.  Saying "gay" and/or "homo" to and around Justin.

i.  Saying "fag" or "faggot" to or around Justin.

j.  Calling Justin "cocksucker."

85.  General Manager Jonas sometimes asked the other Production Supervisors if they were hearing anything on the floor about Justin.

86.  The other Production Supervisors told Jonas that they heard employees refer to Justin as a "fag" or "faggot" and that employees still talked about Justin and the video.

87.  Jonas did not take any action to stop the harassment.

88.  From approximately April 2024 through July 1, 2024, Kristin Walker-Smith, an HR Manager from another Amsted plant, filled in while Defendant searched for HR Manager Gilbert's replacement.

89.  Shortly after HR Manager Walker-Smith began her interim role, Justin complained to her about consistently being harassed because of his sexual orientation.

90.  Justin told Walker-Smith that he had complained to Fred Gilbert multiple times over the prior year.

91.  Walker-Smith said Gilbert did not "relay any of this information" to her and that she did not know there was any ongoing investigation.

92.  Walker-Smith told Justin she would look into it.

93.     Defendant still failed to take any action to prevent or correct the harassment, and Justin's coworkers continued to harass him because of his sexual orientation.

94.     On July 2, 2024, Lisa Bonner began working as the new HR Manager at Defendant's Keokuk plant.

95.     In approximately August 2024, HR Manager Bonner called Justin to her office and told him that she wanted to discuss  the way Justin talked to employees because Joe Kirchner had talked to her about it.

96.     Justin told Bonner that Kirchner had gone to HR several times in the past to try to get him fired.

97.     HR Manager Bonner asked Justin why Kirchner would be targeting him, and Justin responded he believed it was because he is bisexual.

98.     Justin told Bonner that Production Supervisor Cody Ryan told Justin that employees told Ryan that Kirchner "hates gay people."

99.     Bonner told Justin that she would investigate his claims and get back to him, but she did neither.

**The Harassment Worsens and Plaintiff Continues to Oppose It**

100.    On Thursday, September 26, 2024, the pouring station in Justin's department broke down because the gearbox that moved the station north and south got stuck in a divot that had been created from use over the years.

101.    This was not the first time this breakdown occurred.

102.    To keep the machine operating, the gearbox would either need to be replaced or manually moved out of the divot with a pipe wrench.

103.    The machine would be down six to eight hours if Defendant replaced the gearbox.

104.    When the breakdown occurred in the past, Production Manager Kyle Meinhardt instructed Production Supervisors to have Mechanics use a pipe wrench to manually move the gearbox and to ensure the remote that operated the machine was always with anyone who went up to move the gearbox.

105.    On the night of September 26, Justin reported the reoccurrence of the breakdown to General Manager Jonas and Production Manager Meinhardt.

106.    Meinhardt instructed Justin to have a Mechanic go on top of the station with the remote and use a pipe wrench to get the station moving again.

107.    Justin told the Operators in his department and the Mechanics, "No one goes up there without the remote."

108.    Justin and a Mechanic went up about three to five times that night to get the station un-stuck using a pipe wrench. Each time, Justin took the remote with him.

109.    As the crew was going into another heat, Mechanic Adrian Unger was standing on the closedown platform (a safe area) and Justin told him, "We might have to do that again if it does not move."

110.    The station was not stuck and the crew operated it with the remote from the floor, like they normally would.

111.    Apparently, Unger had gone up top even though Justin never told him to and even though he did not have the remote. Unger was on top of the pouring station when the crew operated it as normal.

112.    Justin did not know Unger had gone up on top of the pouring station.

113.    Thankfully, Unger was not injured.

114.    When the station got stuck again on a later heat, Justin called for a Mechanic and, when Unger came to the department in response to the call, Justin asked him to go up top.

115.    Unger became furious, threw his hard hat, and yelled at Justin, claiming Justin "could have killed" him the last time. During his tirade, Unger called Justin a "cocksucker."

116.    Justin immediately called for a union representative and asked Unger and the union representative to meet him in the Supervisors Office.

117.    Electrician Mike Clark accompanied Unger to the Supervisors Office to serve as a union representative.

118.    When they arrived at the office, Justin asked Unger what was going on and what he had gotten so upset about.

119.    Unger started yelling again, saying, "You almost fucking killed me."

120.    Justin responded, "Adrian, no one knew you were up top. You have to tell people if you are going up there, so we know."

121.    Unger claimed Justin told him to go up on top of the pouring station to move it, and Justin denied giving that instruction on that heat.

122.    Unger started yelling and cussing and called Justin a "cocksucker" again.

123.    As Mike Clark tried to pull Unger out of the office, Justin said Unger was being sent home for the way he had talked to Justin.

124.    Clark then became enraged and stormed up to Justin's desk, leaning over it with his finger in Justin's face. Clark said, "We have already had our issues with you, motherfucker."

125.    Production Supervisor Kenny Lambert, who was in the office, stepped in and said, "Mike, that's enough. It's getting threatening now."

126.    Clark said, "It's not a fucking threat, it's a fucking promise."

127.    Justin told Clark he needed to gather his things and leave the plant for the way he talked to Justin.

128.    As Clark walked out of the Supervisors Office door, he turned around and said to Justin, "Fuck you, you motherfucking faggot," then stormed off.

129.    At 11:48 p.m. on September 26, Justin sent an email describing the incident at the pouring station and his interactions with Adrian Unger and Mike Clark to HR Manager Lisa Bonner and copied Production Manager Kyle Meinhardt, General Manager Corey Jonas, Production Supervisor Kyle Jenkins, and Production Supervisor Kenneth Lambert.[1]

130.    At 12:53 a.m. on Friday, September 27, Justin emailed Warning Request forms to HR Manager Bonner and copied Jonas; Meinhardt; and Production Supervisors Cody Ryan, Taylor Worrell, Kyle Jenkins, Kenneth Lambert, and Nathaniel Moore.

131.    In his September 27 email, Justin complained that the harassment was "getting out of hand and becoming very threatening and intimidating." He wrote, "Tonight I was called a fucking faggot and fucking cocksucker. I was approached at my desk with a finger less than an inch from my nose being screamed at. I am starting not to feel safe when I pull employees into the office to have documented conversations. **This is one of many times this has happened in the past year and a half.**" (emphasis added)

132.    On Saturday, September 28, HR Manager Bonner, General Manager Jonas, Production Manager Meinhardt, and Maintenance Manager Jacob McAfee interviewed Mike Clark, Adrian Unger, and Justin about the events that took place the night of the 26th.

133.    Justin answered all their questions truthfully.

---

[1] Production Supervisors Jenkins and Lambert were in the Supervisors Office and witnessed the interaction among Unger, Clark, and Justin.

134. Justin described Unger and Clark calling him a "cocksucker" and "faggot" and feeling threatened by Clark.

135. Justin explained that Production Manager Meinhardt instructed him not to lock out the machine and to keep the plant running by using the pipe wrench to move it manually while the remote was up top with them.

136. Justin followed his supervisor's instructions regarding the pouring station the night of September 26.

137. Justin told the interviewers that he did not tell Adrian Unger to go on top of the pouring station when Unger was nearly injured.

138. Justin said no one knew Unger went up top.

139. It is only common sense that someone would have said something if they knew Unger was on top of the pouring station and saw the crew operating the station with the remote on the floor.

140. Justin said there was no way he would have started pouring if he knew Unger (or anyone) was up there.

141. During Justin's interview, General Manager Jonas told him that Mike Clark and Adrian Unger were suspended until further notice.

142. Justin asked Jonas to hold a meeting with Justin and Clark before Clark returned to work to reduce tension so there wouldn't be a hostile work environment. Jonas agreed to do so.

143. Justin's next shift began the afternoon of Sunday, September 29. Unger was also working that day, but Clark was not.

**Plaintiff Discloses His Disability, Requests an Accommodation, and Escalates His Harassment Complaint to Corporate HR**

144.    On Monday, September 30, Mike Clark was at the plant when Justin arrived for his shift. No one had warned Justin that Clark would be working that night.

145.    When Justin walked by him, Clark looked at Justin like he wanted to punch Justin, and the look scared Justin and he felt threatened.

146.    As his shift went on, Justin's anxiety got worse, he began to have a panic attack, and he requested leave for his mental health condition.

147.    At 8:12 p.m., Justin sent a text message to General Manager Jonas and said he was not comfortable working around Mike Clark and had anxiety since the second Justin saw Clark at work. Jonas told Justin to call HR Manager Bonner and said that Clark was not supposed to be at work.

148.    Justin called Bonner, but she did not answer. Justin left a message, telling her how he was feeling and asking that another supervisor send Clark home if he wasn't supposed to be there or that Justin would need be allowed to go home if Clark *was* supposed to be there.

149.    HR Manager Bonner did not return Justin's call that night.

150.    Justin began experiencing a panic attack at work.

151.    At 8:53 p.m., on September 30, Justin sent texts to Production Manager Meinhardt and General Manager Jonas, telling them he needed to leave work because, "My anxiety is through the roof and I am physically and mentally not okay being around Mike Clark at this point. I've tried calming myself down but I can't… I was on the verge of taking myself to the hospital I was shaking so bad."

152.    Meinhardt told Justin via text, "Thanks for let me know so I can get someone there to help Nate. We need to talk about this tomorrow and figure it out."

153.    Justin agreed, saying, "yes we need to figure all this out. I cannot do another night like I had this evening."

154.    The next morning, Tuesday, October 1, at 6:12 a.m., General Manager Jonas sent an email to HR Manager Bonner reciting the text messages exchanged between Justin, Jonas, and Meinhardt on September 30.

155.    At approximately 8:15 a.m. on October 1, HR Manager Bonner called Justin. Bonner's notes reflect that her intention was "to speak with Justin about the work situation the prior evening regarding his anxiety and not feeling safe."

156.    Bonner told Justin to take "the next couple days off" so he could "rebound."

157.    Bonner assured Justin he was not being punished.

158.    After getting off the call with Justin, Bonner sent an email at 8:40 a.m. to Amsted's Director of HR and Safety, Pamela Arnold, and General Manager Corey Jonas, regarding "Johnson, Clark, Unger Investigation."

159.    Bonner attached her notes and some documents related to the investigation to the email and said Jonas was typing up his notes as well.

160.    Bonner advised Arnold that Unger was suspended for one day on Friday, September 27, and Clark was suspended for five days: Friday, September 27 and Tuesday – Friday, October 1 – 4.

161.    Then, Bonner wrote, "Due to new information and the seriousness of the situation(s), further investigation is required by Corey and me."

162.    Defendant did not conduct any further investigation.

163.    Justin called Director of HR and Safety Pamela Arnold on October 1.

164.    Justin told Arnold that he had been harassed about his sexuality for a very long time.

165.    Justin told Anderson the night of the 26th was not the first time Mike Clark harassed him because of his sexual orientation.

166.    Justin told Arnold about the video of him that his coworkers circulated and that he had complained about it multiple times, including to former HR Manager Fred Gilbert.

167.    Justin told Arnold that he came out to Gilbert and told Gilbert he is bisexual.

168.    Justin told Arnold that he was still being harassed about the video and still being called a "faggot."

169.    Justin expressed his dismay at having been suspended for two weeks for using the word "gay" in a text message when the people who had been harassing him for months were never disciplined.

170.    Justin told Arnold that he had a panic attack on September 30 because Mike Clark was back in the plant and Justin felt unsafe.

171.    Arnold told Justin that she would call HR Manager Bonner and they would investigate.

**Defendant Fires Plaintiff**

172.    On October 2, 2024, General Manager Jonas decided to fire Justin.

173.    On October 3, Bonner told Justin to come to the plant at 1:00 that afternoon to meet with her, Production Manager Kyle Meinhardt, and Operations Manager Mike Huh.

174.    When the meeting began, Production Manager Meinhardt said, "Justin, at this point you are going to be terminated from Amsted Rail for not following safety protocol."

175.    Justin was shocked.

176.    Other supervisors did the same thing as Justin, or worse, and were not fired for not following safety protocol.

177.    Defendant fired Justin at approximately 1:00 p.m. on October 3, 2024.

178.    Corey Jonas was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency

179.    Lisa Bonner was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of her employment and/or agency.

180.    Pamela Arnold was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of her employment and/or agency.

181.    Kristin Walker-Smith was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of her employment and/or agency.

182.    Fred Gilbert was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

183.    Dennis Dooley was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

184.    Kyle Meinhardt was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

185.    Kenny Lambert was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

186.    Jacob McAfee was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

187.    Kyle Jenkins was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

188.    Taylor Worrell was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

189.    Cody Ryan was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

190.    Justin McFadden was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

191.    Cory Von Kiedrowski was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

192.    Joe Kirchner was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

193.    Austin Scheulke was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

194.    Adrian Unger was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

195.    Mike Clark was an employee and/or agent of Defendant Amsted Rail Company, Inc., acting, at all times, within the scope of his employment and/or agency.

### COUNT I
### VIOLATION OF THE IOWA CIVIL RIGHTS ACT
### SEXUAL ORIENTATION DISCRIMINATION AND HARASSMENT/HOSTILE WORK ENVIRONMENT

196.    Plaintiff repleads paragraphs 1 through 195 as if fully set forth herein.

197.    Plaintiff is bisexual.

198.    Defendant subjected Plaintiff to harassment, hostile work environment, and discrimination in violation of the Iowa Civil Rights Act.

199.    Plaintiff's sexual orientation was a motivating factor in the harassment, hostile work environment, and discrimination.

200.    Defendant knew or should have known about the harassment, hostile work environment, and discrimination.

201.    As a result of Defendants' acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, lost wages and benefits, emotional distress, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate him for his injuries and damages, for prejudgment and postjudgment interest, for attorneys' fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the Iowa Civil Rights Act.

## COUNT II
## VIOLATION OF THE IOWA CIVIL RIGHTS ACT
## DISABILITY DISCRIMINATION

202.    Plaintiff repleads paragraphs 1 through 201 as if fully set forth herein.

203.    Plaintiff is disabled within the meaning of the Iowa Civil Rights Act.

204.    Plaintiff suffered from one or more impairments, including but not limited to anxiety, which substantially limited one or more of his major life activities and/or impaired the normal functioning of his bodily systems.

205.    Alternatively, Defendant perceived Plaintiff to be disabled.

206.    Plaintiff was qualified for his position as a Production Supervisor.

207.    Plaintiff could perform the essential functions of his job with or without reasonable accommodations.

208.    Defendant failed to engage in an interactive process with Plaintiff to identify reasonable accommodations

209.    Defendant discriminated against Plaintiff in his employment by terminating him.

210.    Plaintiff's disability or perceived disability was a motivating factor in Defendant's acts and omissions.

211.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, lost wages and benefits, emotional distress, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate him for his injuries and damages, for prejudgment and postjudgment interest, for attorneys' fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the Iowa Civil Rights Act.

## COUNT III
## VIOLATION OF THE IOWA CIVIL RIGHTS ACT
## RETALIATION

212.    Plaintiff repleads paragraphs 1 through 211 as if fully set forth herein.

213.    Plaintiff engaged in activity protected by the Iowa Civil Rights Act, including but not limited to when he complained to Defendant about the harassment, hostile work environment, and discrimination he suffered; requested accommodations for his disability; and otherwise opposed practices made unlawful by the Iowa Civil Rights Act.

214.    Defendant retaliated against Plaintiff, including disciplining, suspending, and firing him.

215.    Plaintiff's protected activity was a motivating factor in Defendant's retaliation against him.

216.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, lost wages and benefits, emotional distress, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate him for his injuries and damages, for prejudgment and postjudgment interest, for attorneys' fees and expenses, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purposes of the Iowa Civil Rights Act.

## COUNT IV
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## SEX DISCRIMINATION AND HARASSMENT/HOSTILE WORK ENVIRONMENT

217.    Plaintiff repleads paragraphs 1 through 216 as if fully set forth herein.

218.    Defendant subjected Plaintiff to harassment, a hostile work environment, and discrimination in violation of Title VII.

219.    Plaintiff's sex/sexual orientation[2] was a motivating factor in the harassment, hostile work environment, and discrimination.

220.    Defendant knew or should have known about the harassment, hostile work environment, and discrimination.

221.    Defendant acted with malice and reckless disregard for Plaintiff's federally protected rights.

---

[2] It is impossible to discriminate against a person on the basis of their sexual orientation without discriminating against that individual based on sex. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 660 (2020).

222.     As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, lost wages and benefits, emotional distress, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant, in an amount which will fully and fairly compensate him for his injuries and damages, for appropriate equitable and injunctive relief, for prejudgment and post-judgment interest, for attorney fees and litigation expenses, for the costs of this action, for punitive damages, and for other such relief as may be just in the circumstances and consistent with the purposes of Title VII

## COUNT V
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## RETALIATION

223.     Plaintiff repleads paragraphs 1 through 222 as if fully set forth herein.

224.     Plaintiff complained to Defendant about the harassment and discrimination he suffered because of his sexual orientation and otherwise opposed practices made unlawful by Title VII.

225.     Defendant retaliated against Plaintiff, including disciplining, suspending, and firing him.

226.     Plaintiff's protected activity was a but-for cause in Defendant's retaliation against him.

227.     Defendant acted with malice and reckless disregard for Plaintiff's federally protected rights.

228.     As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including but not limited to emotional distress, lost wages, and other benefits of employment.

WHEREFORE, Plaintiff demands judgment against Defendant, in an amount which will fully and fairly compensate him for his injuries and damages, for appropriate equitable and injunctive relief, for prejudgment and post-judgment interest, for attorney fees and litigation expenses, for the costs of this action, for punitive damages, and for other such relief as may be just in the circumstances and consistent with the purposes of Title VII.

**COUNT VI**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (As Amended)**
**DISABILITY DISCRIMINATION**

229.    Plaintiff repleads paragraphs 1 through 228 as if fully set forth herein.

230.    Plaintiff is disabled within the meaning of the Americans with Disabilities Act, as amended (ADA).

231.    Plaintiff suffers from one or more impairments which substantially limit one or more of his major life activities and/or impair the normal functioning of his bodily systems.

232.    Alternatively, Defendant perceived Plaintiff to be disabled.

233.    Plaintiff was qualified for his position as a Production Supervisor.

234.    Plaintiff could perform the essential functions of his job with or without reasonable accommodations.

235.    Defendant failed to engage in an interactive process with Plaintiff to identify reasonable accommodations

236.    Defendant discriminated against Plaintiff in his employment by terminating him.

237.    Plaintiff's disability or perceived disability was a motivating factor in Defendant's acts and omissions.

238.    In the alternative, Defendant would not have taken adverse action against Plaintiff but for Plaintiff's disability or perceived disability.

239.   Defendant's acts and omissions were intentional, malicious, and/or made with reckless indifference for Plaintiff's rights under the ADA.

240.   As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages including, but not limited to, emotional distress and lost wages and employment benefits.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate him for his injuries and damages, for punitive damages in an amount sufficient to punish Defendant and deter it and others, for appropriate equitable and injunctive relief, for prejudgment and post-judgement interest, for attorneys' fees and litigation expenses, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purposes of the Americans with Disabilities Act, as amended.

## JURY DEMAND

COMES NOW the Plaintiff and demands a trial by jury.

/s/ Whitney Judkins
**TIMMER, JUDKINS & BORLAND, P.L.L.C.**
Whitney Judkins AT0010357
whitney@tjb.law
Kara Eischen AT0014904
kara@tjb.law
1415 28th Street, Suite 375
West Des Moines, Iowa 50266
Telephone: (515) 259-7462
Fax: (515) 361-5390
**ATTORNEYS FOR PLAINTIFF**